State Bank and Trust Company, an Illinois Banking Corporation, as Trustee Under a Trust Created by Lillian B. Buck Under Instrument Dated December 31, 1930, Known as Trust No. 1158, and The First National Bank of Chicago, a National Banking Association, as Trustee Under a Trust Created by Lillian B. Buck Under Instrument Dated February 19, 1931, Known as Trust No. 13702, Plaintiff, v. Park Ridge School for Girls, an Illinois Not-For-Profit Corporation, Defendant-Appellee.

First Church of Christ (Scientist), an Unincorporated Religious Body, Defendant-Appellant.

Gen. No. 48,571.

First District, Second Division.

March 20, 1962.

Robert E. Cook, of Milwaukee, Wisconsin, and Springer & Bergstrom, of Chicago, for appellant.

Van Duzer, Gershon & Jordan, of Chicago (Horace W. Jordan, of counsel), for appellee.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court:

Plaintiffs, as trustees under two separate inter vivos trusts created in 1930 and 1931 by Lillian B. Buck, now deceased, filed a complaint for construction of the trusts and instructions relative thereto. Each of the parties defendant, Park Ridge School for Girls and First Church of Christ (Scientist), made conflicting demands upon plaintiffs, both of whom claimed to be in doubt as to what course to follow regarding the payment of income and corpora of the trusts. Pursuant to a full hearing, the chancellor entered a decree, dated December 23, 1960, holding that the school had not violated the conditions of the trusts and specifically had not violated the conditions of paragraphs 7 and 8 thereof (which were primarily in contention); the decree provided that the attorneys' fees, costs, and expenses incurred in the proceeding by all the parties be paid from the trust assets. On April 26, 1961 the chancellor entered a final order providing specific disbursements from the trust assets in payment of the attorneys' fees and other expenses incurred in connection with the prosecution of the suit. The church appeals from the decree and the order except for those portions thereof which awarded attorneys' fees, costs, and expenses. The school filed a cross-appeal from such portions of the decree and order as allowed to the church payment from the trust assets of its attorneys' fees, costs, and expenses incurred in these proceedings. The chancellor made the appeal and cross-appeal supersedeas.

The school was organized after the Civil War to help care for girls left without families or homes. In 1879 it was incorporated as the Illinois Industrial School for Girls, but since only State institutions are privileged to use the word "Illinois" as the first word in their titles the name of the school was legally

changed in 1913 to the Park Ridge School for Girls. The Old Soldiers' Home in Evanston was originally used as quarters for the school. In 1883 an improved farm of forty acres was purchased in what is now Park Ridge, and for many years all food and supplies for the school were produced there. As the attendance increased, enlarged quarters became necessary, and in 1908 a building program was begun. The school is presently situated on a fifteen-acre tract of the original farm and is improved with seven brick houses in which the girls reside, a school building, an administration building, a house for the administrator, and two houses for the staff.

The school is governed by a board of directors composed solely of women; over the years it has included many outstanding civic and welfare leaders—Myra Bradwell, Jane Addams, Mrs. Charles Henrotin, Ella Flagg Young, Mrs. Emmons Blaine, Mrs. James Houghteling, and Mrs. Andrew MacLeish. The settlor of these trusts, Lillian B. Buck, was a member of the board for many years and managed the farm department when it was being operated. The first trust, dated December 31, 1930 and administered by the State Bank and Trust Company of Evanston, provided for the erection as well as the maintenance of the Orlando J. Buck Hall; the second trust, dated February 12, 1931 and administered by the First National Bank of Chicago, provided for the maintenance of Buck Hall.

In recent years the average attendance at the school has been forty-four girls, ranging in age from twelve to nineteen years, sent there principally through the family court and other county courts. The intake policy is nonsectarian, and girls of various religions are accepted. The school maintained on the premises covers seventh grade through first-year high school and is academically accredited. The Park Ridge School is accredited by the Welfare Council of Metro-

politan Chicago, the Social Service Exchange, the Chicago Association of Commerce and Industry, and the Community Fund of Chicago. Its sources of revenue are contributions from individuals and organizations, endowments, and trust funds such as those under consideration. It receives deficit financing through the Community Fund of Chicago. Under the practice of that fund the school is required to prepare monthly accounts of expenditures, classified in accordance with the requirements established by the Community Fund.

Girls who have completed the first year of high school on the grounds are then accredited to go to the Maine Township High School where their tuition costs are assumed by the Park Ridge School. Those girls who are not able to meet the requirements of Maine High School are given vocational training at the Park Ridge School. The school does not offer academic courses during the summer, but during the vacation period a program of recreation is provided in which participation is voluntary.

The school maintains a case-work program with three professionally trained workers who have the responsibility of dealing with any emotional and anti-social problems presented by the girls; the purpose of the program is to help them clarify their position with respect to society, and to return them to their families and to society as quickly as possible.

Except for the numbers of the trusts, dates of execution, and other differences not here relevant, both trust agreements are substantially similar. Each preamble recites that the school maintains a home for girls who are dependent or in need of charitable aid. Paragraph 7, one of the provisions out of which this controversy arises, provides that the trustee of each trust shall make quarterly payments to the school for the care, maintenance, and upkeep of Orlando J. Buck Hall

400

"so long as said School is operated strictly as a Protestant institution and lives up to the conditions hereinafter set forth, and the term 'Protestant institution' is hereby understood and agreed to be as follows:

> "Membership on the Board of Directors or on the teaching staff or in the housing administration of the Park Ridge School for Girls of any person of the Roman Catholic faith shall be understood to violate the provisions of this Trust";

and further provides that in such event "said Trust Estate then remaining shall be turned over" to the "Mother Church—the First Church of Christ Scientist" of Boston, Massachusetts or San Francisco, California for certain specific uses.

With respect to paragraph 7 it appears from the evidence that during the period involved in this litigation sixty-three women have served on the board of directors, none of whom has been of the Roman Catholic faith. Nine persons have served on the teaching staff, none of whom has been of the Roman Catholic faith. Three executive directors have been employed, but no case-work administrator or assistant director has been employed. None of the persons so employed has been of the Roman Catholic faith. Seventy-five other employees have been on the pay roll of the school, ten of the Roman Catholic faith: one janitor, one relief switchboard operator, one maid, one dietician, three housemothers, one relief housemother, one summer program director, and one assistant group worker or housekeeper. Each cottage in which the girls reside has a housemother who lives there on a twenty-four-hour basis five days a week. During the time the full-time housemother is off duty a relief housemother is assigned to the house. Approximately nine housemothers are employed by the

school at any given time. If the housemother is married and has a family, they live in the cottage with her. The job description specifically provides that "the mothers of cottage groups are under the general supervision of the Casework Administrator and the direct supervision of the Executive Director." It appears from the undisputed testimony that the housemothers are responsible for implementing the rules and regulations set up by the executive director. A housemother acts as a substitute mother, creating a homelike atmosphere and maintaining a well-run household; she supervises the girls with respect to personal care, social behavior, and housekeeping duties. The girls come to their housemother for advice on minor problems—what clothes to wear, what boys to date; but any emotional problems are referred to the caseworker. Housemothers are directed to encourage each girl to attend the church of her choice and to make arrangements therefor, but not to force a child to go to any church. Although no professional training is required of a housemother it is sometimes difficult for the school to attract suitable applicants; it recruits such employees by means of newspaper advertising.

With respect to paragraph 7, the chancellor found that the Park Ridge School complied with the terms of the trusts. In his oral remarks at the time the case was decided he observed that "there was a reason for the woman's act in giving the money. That was, that she wanted to see the school maintained and taken care of, as far as she could, that is, the administration of an institution based on the Protestant aspect." Park Ridge School at the time the Buck trusts were created was a Protestant institution and is at the present time generally regarded as such. In its essential aspects it has been and is now operated as a Protestant institution within the requirements set forth in the trust agreements. It is conceded that these requirements were observed in that persons of the

Roman Catholic faith were excluded from membership on the board of directors and from membership on the teaching staff. Dispute arises as to whether employment of four Catholic housemothers in the third category, the housing administration, and of Joseph Magee, a Catholic, as summer recreational director, violated the trusts. The chancellor held that the housing-administration category includes only the top-level executive core which makes policy; that it does not include such employees as janitors, maintenance men, maids, dieticians, housekeepers, or housemothers, who carry out the policy and maintain and operate the housing facilities. In his oral remarks the chancellor expressed his findings as follows:

"The Court's view, after hearing all that has been said, is that the word 'Directors' and the word 'Teachers' and the words 'housing administration' include the top level and do not include the bottom, do not include the middle, have nothing whatever to do with the use of persons in service to do the bidding of the administrators. . . ."

We think this finding of the chancellor follows the usual and customary use of the words employed by Mrs. Buck. The key word is "administration," which is defined in Webster's New World Dictionary of the American Language (College Ed, World Publishing Co., c 1957) as: "1. management. 2. the management of governmental or institutional affairs. . . ."

The trusts read that "membership . . . in the housing administration of the Park Ridge School for Girls of any person of the Roman Catholic faith shall be understood to violate the provisions of this Trust"; the church interprets this to mean that "the negative condition . . . required of Park Ridge by Mrs. Buck was:

"1. Not to allow membership [as an employee or otherwise]

 A. On the Board of Directors
 B. On the teaching staff, or
 C. In the housing administration

of any person of the Roman Catholic faith."

In deciding the issues the chancellor was required to limit his consideration to the words actually used, to give to each word its usual and customary meaning within context, and not to rewrite the agreements so as to give them the construction for which the church contends. Specifically the church argues that the term "housing administration" was intended to include housemothers. If it had been the intention of the settlor to convey the meaning contended for it would have been easier and more appropriate for her to use some such phrase as "housing personnel" or "employees generally engaged in housing and sheltering the girls." It appears that during the period of litigation only one person, the executive director, constituted the membership of the housing administration; this came about because during that period the school did not fill the posts of case-work administrator and assistant director described in the school statement of personnel practices. Under the organization spelled out in this directive the executive director, the assistant director, and the case-work supervisor would properly constitute the housing administration. Of necessity organizational charts are modified over the years, position titles change; it is fair to infer that to keep the trusts workable and flexible the general phrase "housing administration" was used rather than specific titles of positions for this particular executive area. The chancellor recognized that the category of housing administration contemplated a managerial group; referring to the board of directors,

the teaching staff, and the housing administration, he pertinently observed that "the three things belong together and are the top level of matters, not the intermediate and not the bottom."

If, as the chancellor held, the usual and customary meaning of the language employed limits the foregoing three categories to executive groups, and if they were so limited, as the evidence discloses, the Park Ridge School has a Protestant posture and is operated strictly as a Protestant institution, even though it maintains a nonsectarian intake policy, accepts girls of the Roman Catholic faith, and employs Roman Catholics in the lower-echelon positions in the school. That, we think, is what the settlor meant to require under the language she used in the trust agreements.

The church devotes a considerable portion of its brief to the importance of the position of housemothers; three housemothers and one relief housemother were Roman Catholics. The contribution of this role to the successful operation of the school is self-evident since, in order to properly serve dependent adolescent girls, the school must have as housemothers women who meet the requirements set up by the school—women who are mature, well-adjusted, in good health, and emotionally stable. The fact remains, however, that the housemothers merely carry out the policies, rules, and regulations set up for them; they do not make the policies, nor formulate rules and regulations. For example, they see that the girls abide by the hours set by the housing administration, but they do not have authority to extend the hours a girl is permitted to be out; only the director or caseworker has that authority. If the housemother is to be included in the category of housing administration, as the church contends, it can be only because she has something to do with the housing or sheltering of the girls; by the same token, janitors, maids, housekeepers, or other

405

persons who see that the houses are properly maintained and equipped would have to be included; but the church does not complain because some of these employees are of the Roman Catholic faith. If the interpretation contended for by the church were to be accepted, it could be argued that the school could not safely employ anyone of the Roman Catholic faith without violating the trust agreements. If that is what the settlor meant it would have been simple for her to say so.

Through the years the school has consistently followed the settlor's requirement that persons of the Roman Catholic faith be kept off the board of directors. There was one instance when the board learned, shortly after an election, that it had elected as a director a member of the Roman Catholic Church; it immediately called her attention to the provision of the trusts with respect to the exclusion of Roman Catholics, with the anticipated result that the new board member resigned.

The parties to this suit stipulated that in determining the issues the period under consideration would be limited to January 1, 1956 to August 10, 1961. In December 1956 Miss Annaliese Litterst, a Roman Catholic, was hired as an assistant group worker, and later designated a senior house supervisor. Although she had various titles the testimony disclosed that her actual duties were primarily in the kitchen where she was being trained as a dietician and general housekeeper, and that on occasion she took the girls shopping. In June 1957 the school replaced its executive director. One of the problems facing the new acting director, Charles Causer, was the need for two additional housemothers. Both he and his predecessor had reported difficulty in screening such applicants on a religious basis, and in July 1957, for the first time, a Roman Catholic was engaged as a housemother to

fill one of the existing vacancies, and subsequently two other Roman Catholics were engaged as housemothers and still another Roman Catholic as a relief housemother. In June 1957 Joseph Magee, a Roman Catholic, was employed as the director of the summer recreational program. During the regular school year he was a mathematics instructor at Mendel Catholic High School, and there is evidence that he tutored two Park Ridge girls that summer who were enrolled in mathematics courses at the Maine Township High School; this was incidental to his direction of the summer recreational program and was voluntary on his part.

It was becoming increasingly apparent at the Park Ridge School that an employment policy requiring exclusion of Roman Catholics was difficult to administer and unsatisfactory in its results. In July of 1957 the board adopted what may be called a changing-times resolution:

"Due to the changing times, . . . we cannot operate under the conditions of the Buck will [trusts], and through Mr. Edward Price [counsel for the Park Ridge School] this will be discussed with Mrs. Buck [the daughter-in-law of the late Lillian B. Buck] and her lawyer, and it is hoped that some amicable agreement will be reached."

In August 1957 William Bardwell, an attorney representing the church, called to the attention of the trust officers of both trustees in this suit conduct on the part of the school that he considered to be in violation of the terms of the trusts, specifically mentioning to the officers of the State Bank the employment of Miss Litterst and Mr. Magee; and he orally demanded payment of the trust incomes and corpora to the church. The First National Bank indirectly apprised Mr. Price, the Park Ridge School counsel, of

407

the complaint by the church, and the bank then investigated the matter. On September 25, 1957 a trust officer of the State Bank wrote to the Park Ridge School advising that a report had come to the attention of the bank that Miss Litterst and Mr. Magee had been employed by the school in violation of the trust provisions, and concluding that "until there has been a definite determination in this respect, we feel we have no choice other than to refrain from making payments to your school." The First National Bank of Chicago orally advised the school to the same effect at about the same time. Under paragraph 8 of the trust agreements the school was required to submit certificates of compliance periodically; at this point it suspended submitting such certificates until the matter could be clarified, and a series of exploratory meetings and correspondence was carried on between the attorneys representing the various parties. The result of these negotiations was that the church made it clear that it would not be satisifed with anything less than a complete forfeiture by the school. The board therefore found itself faced with a choice between two courses of action: complying with the church demand and giving up the much-needed funds, or submitting to the court the school's interpretation of the agreement together with its conclusion that it was entitled to continue to receive the funds. Having thoroughly studied the trust agreements, the board decided that there was no violation of either the letter or the spirit of the agreements, and elected to accept the burdens of litigation. This decision was reflected in the resolution of September 18, 1958 reciting the facts with respect to the hiring of personnel and the objections thereto by the church, in which the board stated that in its considered opinion employees of the school classified as housemothers "are not members of the housing administration of the School, that their

408

employment does not violate either the spirit or the letter of said trust agreements and that it would be improper for this Board, acting in its fiduciary capacity, to disclaim any interest of the School in said trust funds." The resolution directed the proper officer to submit a certificate of compliance; after it was prepared it was sent to the trustees, and this suit followed. Over the objection of counsel for the church, the trial court admitted this resolution in evidence, together with conversations and explanations relating thereto. The church contends that the resolution and the explanatory material were self-serving and should not have been admitted, but the trial court made it clear that they were admitted to establish the continuity of evidence and the background which led to the filing of the suit, and to rebut the assertion by counsel for the church that the school had admitted violations of the trusts.

██ From a careful examination of the lengthy record presented we are satisified that the finding of the chancellor that the school was in compliance with the terms of the trust agreements is amply supported by the evidence and is proper.

██ This leads to the provisions of paragraph 8 of the trusts which required the filing of quarterly statements of compliance by the school. The church contends that failure to file such statements over a period of approximately sixteen months constituted a violation of the trust agreements. Until June 1957 the school regularly filed the required certificates. As heretofore stated, in August of that year Mr. Bardwell, attorney for the church, called on the trustees, claiming that the school was violating the trust agreements because of its employment of Miss Litterst and Mr. Magee. The following month the trustees notified the school that they would refrain from making any further payments until there was a definite resolution

409

of the controversy. One of the trustees, the First National Bank of Chicago, orally advised the school that it would no longer be able to honor any certificates of compliance from the school, as required by paragraph 8, pending determination of the controversy. At this point the school therefore commenced suspending such certificates, and the exploratory conferences and correspondence heretofore mentioned between the respective parties followed; after thorough study of its position and weighing the alternatives open to it, the board decided that the school had not violated the trust agreements and adopted its resolution of September 18, 1958. At the same time the board directed that a certificate be filed so that the board would be in technical compliance. Such certificate was filed October 9, 1958 and provides a proper basis for a judicial determination of the controversy between the school and the church. This proceeding was subsequently instituted, and no certificates were filed by the school pending the decision of the chancellor and the entry of the decree. Since the trustees notified the school that they could no longer honor the certificates from the school, filing such certificates would have been a useless and an ineffective act not required in equity, and the chancellor properly followed equitable principles in refusing to sacrifice the school's rights. Knights v. Knights, 300 Ill 618, 622, 133 NE 377 (1921), and Smurr v. Kamen, 301 Ill 179, 186, 133 NE 715 (1921), enunciate the principle that "equity looks through forms to the substance of a transaction, and will not permit the rights of parties to be sacrificed to the mere letter but will look to the spirit of the transaction to discover the truth."

██ ██ The decree of December 23, 1960 reserved jurisdiction with respect to the allowance of fees and costs to all parties in the suit. Subsequently, on April 26, 1961, a final order was entered awarding fees to

410

the trustees, to the school, and to the church for services rendered by their respective counsel, together with costs incurred in connection with the litigation. The school has filed a cross-appeal questioning that portion of the decree which allowed the church to recover from the trust assets its reasonable attorneys' fees, costs, and expenses. Counsel for the school argue that the church, as the unsuccessful litigant, should bear its own expenses and attorneys' fees, citing McCabe v. Hebner, 410 Ill 557, 102 NE2d 794 (1951), and Wechter v. Chicago Title & Trust Co. (Abst), 330 Ill App 614, 71 NE2d 924 (1947). In the McCabe case the court assessed all costs against plaintiffs because they prolonged hearings before the master by introducing large quantities of incompetent exhibits and evidence and made the record excessively long. The Wechter case does not involve the allowance of fees in a similar situation and is not in point. Under the Costs Act (Ill Rev Stats 1961, c 33) the award of costs (which impliedly includes solicitors' fees) is discretionary. Section 18 provides that full costs be assessed against plaintiff if he dismisses his suit or if defendant dismisses it for want of prosecution, and continues: "in all other cases in equity, not otherwise directed by law, it shall be in the discretion of the court to award costs or not; . . . ." For the most part cases pertinent to this question involve construction of trusts contained in wills, but the principles of law are equally applicable to this case. In interpreting the statute Illinois courts have adopted the theory that equity requires that attorneys' fees be awarded to all the litigants in a situation where an honest difference of opinion existed. In re Estate of Reeve, 393 Ill 272, 293–294, 65 NE2d 815 (1946). The chancellor in the case before us was evidently of the opinion that the complaint filed by the trustees reflected an honest difference of opinion as to whether

411

or not the trusts had been violated, and that participation of counsel on behalf of all the parties was necessary for an adequate presentation. In the circumstances we would not be warranted in disturbing his discretionary finding. Accordingly, the cross-appeal of the school is dismissed, and the decree and final order of the Circuit Court are affirmed in toto.

Decree and final order affirmed; cross-appeal dismissed.

BRYANT and BURKE, JJ., concur.